## TOWN & COUNTRY PROPERTIES, INC.

### V.

## R. JOHN RIGGINS

Record No. 940914

April 21, 1995

Present: All the Justices

*Leslie M. Alden (Verner, Liipfert, Bernhard, McPherson and Hand*, on briefs), for appellant.

*Barrie D. Berman (Fisher, Wayland, Cooper, Leader & Laragoza*, on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

Code § 8.01-40(A) provides that if any person's name is used "for advertising purposes or for the purposes of trade," without first obtaining the individual's written consent, such person may sue and recover damages from the person, firm, or corporation so using the name "for any injuries sustained by reason of such use." The main issue in this appeal is whether the statute is unconstitutional as applied under the facts of this case to a corporation engaged in the sale of residential real estate.

The relevant facts are virtually undisputed. The plaintiff-appellee is John Riggins, formerly a prominent professional football player. After playing four years of college football at the University of Kansas, Riggins was chosen in the first round of the 1971 professional football draft by the New York Jets team. After playing five years with the Jets, Riggins was acquired by the Washington Redskins. He played for the Redskins for nine full seasons, completing his career as an active player in 1985. Because of his skill and accomplishments as a football player, Riggins was in-

ducted into the Pro Football Hall of Fame in 1992. He described the honor as "a lifetime achievement award." As the result of his athletic exploits, Riggins became a celebrity nationwide and especially in the Washington, D.C. area.

The evidence showed that Riggins has been compensated over the years for use of his name in the endorsement of many products and has been paid for personal appearances at various functions. He always charges a fee for endorsements and always charges a personal appearance fee, except when his presence is connected with a charitable cause. His fees range from $5,000 to $90,000. He has been employed by Washington radio and television stations. Riggins currently works as a part-time commentator on an all-sports radio program in the metropolitan Washington area for which he is paid $40,000. The radio station advertises the fact that he works there.

Riggins testified these uses of his name presently are his "livelihood," saying, "I was very fortunate and had the talent to play at a level that was different from most of the people I played with. And I think I built a name which basically now to this day provides me with a living."

In 1991, the plaintiff and his wife, Mary Lou Riggins, were divorced. Pursuant to a property settlement agreement, the plaintiff conveyed his ownership interest in the marital home, located in Vienna, Virginia, to his former wife. Later that year, Ms. Riggins obtained a license as a real estate salesperson and became associated with defendant-appellant Town & Country Properties, Inc., in its Vienna branch office.

In 1992, she decided to sell the former marital home. To generate interest in the property, she arranged for a "brokers' open" to be held on the premises. Testimony described a "brokers' open" as "a solicitation of other brokers and sales associates to come view the house in the hope that they [will] know where the property is and they can find it comfortably and they will introduce it to their customers in the course of selling real estate."

In order to advertise the brokers' open, Ms. Riggins drafted, and arranged for the printing and distribution of, a flyer that is the focus of this controversy. The flyer is an eight-and-one-half by eleven-inch handbill printed with a photograph of the home's exterior near the center of the page. A partial reproduction of the flyer, not to scale, appears below.

**BROKERS OPEN**

June 16 - 11 AM to 1 PM

**COME SEE. . .**

# John Riggins'

Former Home,

Photograph

**$849,500**

*Register to win an autographed football*

Menu
Honey Baked Ham
Famous Rice Ring
Homemade Chocolate Cake and
Lemon Squares etc.

Directions: From 66, Rt. 123 North to a left onto Hunter Mill Rd. Go 3.2 miles to a left onto Wickens. Take the first left onto Vickers Drive. Go to the Col-de-Sac and it's the second driveway.

10611 Vickers Dr.

Mary Lou Riggins
Home: 938-4199
Office: 938-5800

At the foot of the page on the left appears defendant's logo opposite Ms. Riggins' telephone numbers.

The printing company that prepared the flyer distributed 1,610 copies to real estate offices in Great Falls, McLean, Vienna, Oakton, and Tysons Corner. Approximately 78 persons attended the brokers' open. Following an "open house" on June 21 to show the home to the public, a contract of sale for $745,000 was executed on June 25. The purchasers did not see the flyer, but purchased the home as the result of a visit when it was open to the public. The defendant received a commission of $44,700 on the sale.

Plaintiff did not give his consent to the use of his name nor was he asked or contacted by either Ms. Riggins or any of defendant's principals requesting permission to use his name on the flyer. Plaintiff first learned of the flyer during "the third week in June in 1992," when he was performing as an actor in a play in Olney, Maryland. A friend informed plaintiff that she had seen "this ad" and asked him about it. He was unaware of its existence and subsequently procured a copy.

Plaintiff stated that when he first saw the flyer, he was "angry," "humiliated," and felt a loss of "integrity and dignity." Plaintiff said he felt "violated" and that his "livelihood" had been "threatened by this flyer." He stated, "I didn't even deserve a phone call. That's how little the people that did this thought of me, I guess." He said, "[T]his is not unlike somebody stole something from me. They clearly took my name and used it for their commercial purposes without any regard for me. I've had things stolen from me before and it is not a good feeling." He stated, "[I]f this is allowed, if this is okay, then basically the living or the life I am trying to live and the money I'm trying to earn is not going to be possible because my name belongs to everybody, it does not belong to me." He said that the flyer was "deceptive," because, at first glance, "I think John Riggins is going to be there. Then I see it's his former home and I'm somehow disappointed, and possibly angry at John Riggins for baiting me like that." He called the flyer "tasteless" and "unsophisticated" because "John Riggins . . . is being associated with the famous rice ring. That really doesn't do much for me."

In August 1992, plaintiff filed the present action against defendant seeking recovery of compensatory and punitive damages. In a three-count motion for judgment, plaintiff sought recovery for

"statutory conversion" pursuant to Code § 8.01-40(A), trover and common-law conversion for misappropriation of his "name and reputation without his express written consent," and "breach of quasi-contract" based on defendant's alleged unjust enrichment at plaintiff's expense.

In a January 1994 trial by jury, the court ruled that questions of fact had been raised on each of plaintiff's theories of recovery and thus instructed on those issues as well as on compensatory and punitive damages. On a special verdict form, the jury found in favor of the plaintiff on the conversion counts only, and fixed compensatory damages at $25,000 and punitive damages at $28,608.

We awarded defendant an appeal from the March 1994 judgment order confirming the verdict. The appeal was limited to consideration of the constitutional question and to whether "intangible rights" can be converted, whether Code § 8.01-40(A), if constitutional, was violated, whether the court erred in admitting expert testimony about the value of plaintiff's name, whether the compensatory damage award was supported by the evidence, whether the court erroneously instructed the jury on the standard for an award of punitive damages, whether the court erred in refusing to admit evidence of plaintiff's arrests for driving a vehicle while under the influence of alcohol, whether the court erred in refusing to instruct on nominal damages, and whether the court erred in refusing to reduce the punitive damage award to conform to the *ad damnum* clause of the motion for judgment.

First, defendant contends that the trial court's assessment of damages against it for an agent's disclosure of truthful, public information violates the free-speech provisions of the First Amendment to the United States Constitution and Article I, Section 12, of the Constitution of Virginia. Defendant argues that although the reference to "John Riggins" by defendant's agent "was presented in a flyer rather than a news report, such publication nevertheless is entitled to First Amendment protection."

Arguing that the utterance here is constitutionally protected "commercial speech," defendant says that the flyer did not suggest that the plaintiff endorsed defendant or the subject property, but "truthfully announced a luncheon to be held at a home for sale which was formerly owned by Mr. Riggins." Defendant contends, "A flyer stating that the Property is 'John Riggins' former

home' when, in fact, the Property *is* John Riggins' former home, cannot be construed as misleading."

Noting that plaintiff's former ownership of the property was freely available to the general public from the Fairfax County land records and contending that "the identity of his ownership is an immutable characteristic" of the property, defendant argues that "Mr. Riggins has no privacy or property interest in it at all." Quoting *Cox Broadcasting Corp.* v. *Cohn*, 420 U.S. 469 (1975), defendant says "interests in privacy fade when the information involved already appears on the public record." *Id.* at 494-95.

Summarizing, defendant argues that to penalize it "for allegedly publishing a true fact attendant to conducting a lawful activity is an illegal restriction on free speech." We do not agree with defendant's contentions.

Prior to 1890, no American court had granted relief expressly based upon invasion of the so-called "right of privacy." At the present time, however, the right is recognized in virtually all jurisdictions. W. Page Keeton Et Al., *Prosser and Keeton on The Law of Torts* § 117, at 849-51 (5th ed. 1984). Virginia is among a few states, including New York, that recognizes a right of privacy in a limited form by statute. *Id.* at 851. The right is acknowledged in Virginia in the statute at issue, Code § 8.01-40(A), and in Virginia's Privacy Protection Act of 1976, Code §§ 2.1-377 to -386.

Code § 8.01-40(A) provides that if a person's "name, portrait, or picture" is used for "advertising purposes or for the purposes of trade" without written consent, the person may maintain a suit in equity to prevent the use, and may sue and recover damages for any injuries resulting from such use. Code § 8.01-40(A) is substantially similar to §§ 50 and 51 of the New York Civil Rights Act. N.Y. Civ. Rights Law §§ 50-51 (McKinney 1992). Therefore, as we interpret the statute in connection with the constitutional attack, we will look to New York courts for guidance. *See Falwell* v. *Flynt*, 797 F.2d 1270, 1278 (4th Cir. 1986), *rev'd on other grounds*, 485 U.S. 46 (1988).

Use for "advertising purposes" and use "for the purposes of trade" are separate and distinct statutory concepts. *Beverley* v. *Choices Women's Medical Ctr., Inc.*, 587 N.E.2d 275, 278 (N.Y. 1991). Claims based, as here, on the use of a name "for advertising purposes" have received a more liberal treatment by the courts than those based on use "for purposes of trade." *Gautier* v. *Pro-*

*Football, Inc.*, 106 N.Y.S.2d 553, 556 (1951), *aff'd*, 107 N.E.2d 485 (N.Y. 1952). The unauthorized use of a person's name as an integral part of advertising matter "has almost uniformly been held actionable." *Id.* And, a name is used "for advertising purposes" when "it appears in a publication which, taken in its entirety, was distributed for use in, or as part of, an advertisement or solicitation for patronage of a particular product or service." *Beverley*, 587 N.E.2d at 278; *Flores* v. *Mosler Safe Co.*, 164 N.E.2d 853, 857 (N.Y. 1959).

 Applying this test, we conclude that the defendant's flyer clearly is advertising material and a promotional publication. The placement on the document of defendant's logo and the agent's name and telephone numbers, as well as the wide distribution of the piece to a targeted audience leaves no doubt, as the testimony confirms, that the flyer was designed to enhance the probability of ultimate sale of the property.

 We also conclude that plaintiff's name was used "for advertising purposes" in a manner forbidden by Code § 8.01-40(A). Ms. Riggins specifically directed the printer who set the type and distributed the flyer "to make the words John Riggins bigger than the other words" and to make them "stand out." Plaintiff's name, therefore, was an integral part of the flyer and cannot be deemed merely incidental to the flyer's clear commercial message.

Nevertheless, defendant seeks to avoid liability under the statute on the ground that the flyer is commercial speech protected from unwarranted governmental regulation by the First Amendment, as applied to the States through the Fourteenth Amendment. *See Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976). The defendant misapplies the Supreme Court's commercial speech cases to the situation presented here.

 "The First Amendment's concern for commercial speech is based on the informational function of advertising." *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980). In the context of the Supreme Court's commercial-speech decisions, this real estate advertisement is not "informational."

For example, it is not informational in the sense that the advertisement of information on the availability of New York abortions was held protected in *Bigelow* v. *Virginia*, 421 U.S. 809 (1975); or in the sense prescription drug price information was held pro-

tected in *Virginia State Bd. of Pharmacy, supra*; or in the sense that a lawyer's truthful advertisement concerning availability and terms of routine legal services was held protected in *Bates* v. *State Bar of Arizona*, 433 U.S. 350, 384 (1977); or in the sense in-person solicitation of clients by attorneys was deemed to be commercial speech in *Ohralik* v. *Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978); or in the sense use of a trade name conveying information about the type, price, and quality of services offered for sale in optometrical practice was held to be commercial speech in *Friedman* v. *Rogers*, 440 U.S. 1, 11 (1979). *See Ibanez* v. *Florida Dept. of Business and Professional Regulation, Bd. of Accountancy*, ____ U.S. ____, 114 S.Ct. 2084 (1994).

■ Rather, the plaintiff's name was used strictly in a promotional sense to generate interest in the sale of real estate. The use was not relevant to dissemination of information to consumers about the physical condition, architectural features, or quality of the home. Simply, this is not the type of commercial speech accorded constitutional protection.

And, defendant's reliance on cases involving media defendants reporting matters contained in the public record such as *Cox Broadcasting Corp.* v. *Cohn, supra*, is misplaced. Indeed, the Supreme Court said in *Cohn* "that we do not have at issue here an action for the invasion of privacy involving the appropriation of one's name," 420 U.S. at 489, precisely the issue in the present case.

■ Thus, given the facts of this case and paraphrasing language from *Beverley*, defendant's constitutional argument does not require us to diminish the statutory privacy protection against exploitation of plaintiff's name. Ordinary citizens are entitled to the protective mantle of Virginia's statute, and persons in a celebrity status should receive no less coverage in this respect. *See* 587 N.E.2d at 279.

■ Consequently, we hold that Code § 8.01-40(A), as applied to the facts of this case, is not constitutionally invalid under either the free-speech provisions of the First Amendment to the federal constitution or the applicable provisions of the state constitution. Va. Const. art. I, § 12 ("any citizen may freely speak, write, and publish his sentiments on all subjects").

We shall dispose of the remaining issues in summary fashion. The defendant claims the trial court erred in ruling defendant was liable for trover and common-law conversion because, defendant

contends, "intangible rights," such as a name, cannot be converted. We reject this contention.

■ In Virginia, one holds a property interest in one's name and likeness. *Lavery* v. *Automation Management Consultants, Inc.*, 234 Va. 145, 154, 360 S.E.2d 336, 342 (1987). And conversion occurs when, as here, a defendant uses another's personal property as its own and exercises dominion over it without the owner's consent. *Buckeye Nat'l Bank* v. *Huff & Cook*, 114 Va. 1, 11, 75 S.E. 769, 772 (1912). *Accord Nossen* v. *Hoy*, 750 F. Supp. 740, 743 (E.D. Va. 1990). Also, there is no merit to defendant's corollary argument that, because Ms. Riggins did not obtain defendant's authorization before drafting and arranging for circulation of the flyer, plaintiff failed to show defendant approved and derived a benefit from use of plaintiff's name. The evidence established that the office manager of defendant's Vienna branch had actual knowledge of the flyer and took no action to prevent its dissemination. *See Kilby* v. *Pickurel*, 240 Va. 271, 275, 396 S.E.2d 666, 668 (1990) (principal bound by agent's previously unauthorized act when principal ratifies act by accepting benefits with full knowledge of relevant facts).

Having already addressed defendant's contention that, if constitutional, Code § 8.01-40(A) was not violated, we shall move to defendant's argument that the trial court erred in admitting the opinion of plaintiff's expert witness because the opinion lacked "an adequate foundation" and because there was no "causal connection" between the expert's testimony and "the pertinent issue."

Plaintiff's expert was Frederic A. Fried, who had spent seven years in the relatively new industry of sports marketing. The expert is the owner of a "full-service sports marketing company" that specializes "in marketing and promotion of athletes." Fried listed among his present or former clients numerous famous athletes such as Boomer Esiason, quarterback for the New York Jets, Jim Kelly, quarterback for the Buffalo Bills, Troy Aikman, quarterback for the Dallas Cowboys, and Michael Jordan of the Chicago Bulls basketball team. Fried's company handles "anything having to do with major corporate sponsorship and marketing deals for players . . . in all the major sports, basketball, football, baseball, even soccer."

Even though the expert did not represent the plaintiff, who testified that he did not employ a marketing agent, he was thoroughly familiar with the plaintiff who is "a proven commodity"

and who uses the commercial value "accruing to his name for endorsements." The witness explained that it is "essential" for a person like the plaintiff to control the use of his name. He said that "if your business is marketing yourself as an endorsement property, as a valuable commodity, . . . the only way you can do that effectively is to make sure that you and only you control the rights to use your name and likeness."

The expert was asked to examine the flyer and to assume that it was distributed in the Northern Virginia area only to real estate brokers, and that plaintiff was requested to lend his name, and not his face, to the flyer without making a personal appearance. The expert's opinion based on the assumption was that a fee of approximately $50,000 would be charged for plaintiff's endorsement.

"Whether a witness is qualified to express an opinion as an expert is a question largely within the sound discretion of the trial court." *Noll* v. *Rahal*, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979). Clearly, this expert was eminently qualified in the field of sports marketing. The defendant's attack on his testimony as lacking "adequate foundation" and as having no "causal connection" to the issues merely demeans the weight to be accorded the testimony, and does not affect its admissibility. There was no abuse of discretion in admitting the evidence.

Next, discussion of the evidence relating to the preceding issue serves to answer defendant's contention that the compensatory damage award was unsupported by the evidence. Not only was the $25,000 award supported by the expert's testimony, but the plaintiff estimated that the range of his fees for product endorsements was from $20,000 to $90,000. There was ample credible evidence to support the jury's assessment of compensatory damages.

Next, the defendant asserts the "trial court erred in instructing the jury as to the standard for the award of punitive damages." Code § 8.01-40(A) provides that "if the defendant shall have knowingly used such person's name . . . in such manner as is forbidden or declared to be unlawful by this chapter, the jury, in its discretion, may award exemplary damages." The trial court instructed the jury that if plaintiff was entitled to recover compensatory damages for violation of the statute and, employing the statutory language, if the defendant "knowingly used" plaintiff's name without his consent for advertising purposes, the jury could award punitive damages.

■ Defendant argues that "a defendant may act 'knowingly' yet not maliciously or wantonly and, absent proof of wilful, wanton and/or malicious conduct, punitive damages are inappropriate." We disagree. The obvious answer to this contention is that the General Assembly has fixed the "knowingly used" standard for punitive damages in this type of action, and we shall not engage in judicial legislation by adding ingredients not specified in the statute.

■ Next, defendant contends the trial court erred in refusing to admit evidence of plaintiff's "legal difficulties, as such evidence was material to the issue of the value of Mr. Riggins' name." The trial court did not refuse to admit evidence of plaintiff's so-called "legal difficulties." Asserting he "has never been convicted of any crime," plaintiff did not object to defendant's presenting evidence on "what Mr. Riggins' image is in the community." Plaintiff did object, however, to defendant's effort to show that he had been arrested and charged with driving a vehicle while under the influence of alcohol. The trial court correctly sustained that objection. There was no abuse of judicial discretion in holding that the prejudicial effect of exploring the details of such arrests, and the collateral issues that would be raised, outweighed the probative value of such evidence.

Next, defendant contends the trial court erred in refusing to instruct on nominal damages. An award of nominal damages is appropriate when there is a legal right to be vindicated against an invasion that has produced no actual, present loss of any kind or where, from the nature of the case, some injury has been done but the proof fails to show the amount. *News Leader Co.* v. *Kocen*, 173 Va. 95, 107-08, 3 S.E.2d 385, 390-91 (1939). *See Gazette, Inc.* v. *Harris*, 229 Va. 1, 31-32, 325 S.E.2d 713, 735, *cert. denied sub nom. Fleming* v. *Moore*, 472 U.S. 1032, *Port Packet Corp.* v. *Lewis*, 473 U.S. 905 (1985).

■ An instruction on nominal damages was unnecessary in this case. There was abundant evidence on plaintiff's loss caused by the appropriation of his name without his consent, such as the loss of an endorsement fee for advertising defendant's product.

■ Finally, we agree with defendant's contention that the trial court erred by refusing to reduce the punitive damage award to conform to the *ad damnum.* The pertinent instruction permitted the jury to assess punitive damages for the statutory, not common-law, conversion count. The amount of the *ad damnum* for that

count was $25,000. In Virginia, a plaintiff cannot recover more than the amount sued for. *Powell* v. *Sears, Roebuck & Co.*, 231 Va. 464, 469, 344 S.E.2d 916, 919 (1986). Thus, the $28,608 award should have been reduced.

Consequently, we will modify the judgment below by reducing the amount of the punitive damage award to $25,000, and we will affirm the judgment as modified. *See* Code § 8.01-681.

*Modified and Affirmed.*